UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 3:05CR187(JCH) |
| | : | |
| KENNETH MIMS | : | |

RULING ON MOTION TO SUPPRESS

Kenneth Mims ("Mims") has been charged with: (1) being a
felon in possession of a firearm and ammunition, in violation of
18 U.S.C. §§ 922(g)(1) and 924(e); (2) knowingly and
intentionally possessing with intent to distribute a mixture and
substance containing a detectable amount of cocaine base, in
violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and (3)
knowingly using and possessing a firearm, during, in relation to,
and in furtherance of, a drug trafficking crime, in violation of
18 U.S.C. § 924(c)(1).  On August 17, 2005, Mims filed a motion
to suppress the firearm, ammunition, and narcotics that were
seized from his person and other contraband seized from car in
which he was a passenger on March 14, 2004.[1]  For the following
reasons, Mims's motion [doc # 12] is DENIED.

FACTUAL BACKGROUND

On September 21 and 23, 2005, the court held an evidentiary
hearing on Mims's motion to suppress.  The government presented
the testimony of Norwalk police officer Mark Suda ("Officer Suda"
or "Suda") and Norwalk police sergeant Kenneth Michael King

_____

[1]At the request of Judge Hall, Judge Nevas agreed to hear
and decide the motion to suppress.

("Sergeant King" or "King").  Evertha Mims, Mims's sister, testified on Mims's behalf.  Based on the testimony at the hearing and review of the parties' memoranda of law, I find the following facts concerning the events of March 14, 2005.

On the night of March 14, 2004, Officer Suda, a twelve-year veteran of the Norwalk Connecticut police department, was working a "bar closing" detail in South Norwalk when he received information from a confidential informant ("CI").  The CI told Officer Suda that Mims, his cousin Mason Mims, Victor Cruz, and Jeff Moore were at the Moose Lodge on South Main Street and were getting into a light-blue Ford Taurus ("Taurus") bearing Connecticut registration 407-SVM that was parked in front of 75 South Main Street.  Officer Suda knew of all of these individuals from several prior criminal investigations.

According to Suda's police report, the CI told him that the men had narcotics on them and that Mims had a black handgun.  At the hearing, Officer Suda testified that the CI also told him that the black handgun was a semiautomatic weapon and that Mims had been selling crack cocaine.  Suda testified that he had known this CI for approximately six years and that information he had previously provided to Norwalk police officers had proven reliable and credible and had resulted in as many as 60 criminal arrests and narcotics seizures.

After receiving this information from the CI, Officer Suda

2

ran a check on the license plate that the CI had provided to him for the Taurus and confirmed that the vehicle was registered to Mason Mims. At or around 1:00 a.m., Officer Suda conveyed the CI's information to Sergeant King, who was present in the area and supervising the shift. Sergeant King testified that Officer Suda told him that the CI said that the four individuals were possibly in possession of a large amount of narcotics, and that at least one of them had a gun. Officer Suda and Sergeant King arrived in the area of the Moose Lodge to investigate, but did not see the Taurus or the suspects.

At or around 1:45 a.m., Suda again met with the CI who told him that they had missed the Taurus by a minute and that Mims, Cruz, Mason Mims, Moore, and a fifth male named "Donye", were heading in the Taurus to Roodner Court. Officer Suda and Sergeant King then proceeded to Roodner Court. When Officer Suda arrived there approximately three minutes later, the Taurus was parked in front of Building 19, next to a trash dumpster. Suda saw an older-model white Chevy Blazer ("Blazer") parked right directly behind the Taurus. Both cars were illegally parked behind, and perpendicular to, cars that were parked in parking spaces. When he pulled up closer, Suda saw three African-American males sitting in the Taurus. He recognized Mason Mims in the driver's seat, the defendant Mims seated in the left-rear passenger seat behind Mason Mims, and Jeff Moore in the right-

3

rear passenger seat.  At this point, Officer Suda radioed to Sergeant King that he had located three of the individuals they were looking for.

Sergeant King responded over the radio, and said that he was right behind Suda in his police cruiser.  When he arrived he also noticed that Mims was in the Taurus.  Both officers testified that, at this point, they saw Mims exit the Taurus.  When King and Suda approached the Taurus, Mims walked away from the officers, but looked back at them to see where they were going and what they were doing.  The officers ordered Mims to stop, but he did not do so.  Sergeant King brought Mims back to the Taurus, had him place his hands on the front hood of the car, and began a pat-down search of his person.  At or around the same time, Mason Mims and Jeff Moore were told to place their hands on the front dash and the front headrest, respectively, and they complied.

At this point, Sergeant King and Officer Suda noticed that Victor Cruz was seated in the front-passenger seat of the Blazer. Both officers were familiar with Victor Cruz and knew that he had a criminal history and a reputation for involvement in street gangs, drugs, as well as shootings.  Sergeant King went over to the Blazer and Officer Suda continued with the pat-down search of Mims.

Both Officer Suda and Sergeant King called for backup. Sergeant King then noticed Victor Cruz reaching under the front

4

seat of the Blazer.  At the same time, Mims began to be non-compliant, and took his hands off the front-hood area of the Taurus.  Although Officer Suda instructed Mims to put his hands back on the hood, he resisted and questioned Suda about why he was being detained.  At or around the same time, Mason Mims began to remove his hands from the front dashboard of the Taurus.  Suda then pulled his service weapon out of his holster and kept it at a low-ready position with his right hand.  At this time, several backup units arrived at Roodner Court with their lights and sirens activated.

Suda noticed that Mims was becoming increasingly agitated as more officers arrived.  Because he was concerned that Mims would try to flee, he placed Mims's upper torso against the front hood and handcuffed him with his hands behind his back.  Officer Suda then completed the pat-down of Mims's person and he felt a hard object on Mims's left torso in the waistband area.  Based on his experience, he recognized the object to be some sort of weapon or a handgun.  When he pulled up Mims's jacket, Officer Suda saw the black grip of a handgun.  He removed the gun and yelled to the other officers that he had found a gun.  Officer Suda testified that he knew that Mims had a criminal history and felony convictions and, accordingly, knew it was unlawful for him to possess a firearm.

At this time, because Mims was still resisting, and Officer

Suda physically placed him on the ground so that he could
continue the pat down.  In doing so, he found a small plastic
baggy that contained a white, rock-like substance, that he
suspected was crack cocaine, in Mims's right-front pants pockets.

By this time, Mason Mims, the driver and registered owner of
the Taurus, was also in custody after the back-up officers found
crack cocaine in one of his socks.  In addition, because the
Taurus was illegally parked behind, and perpendicular to, a row
of parked cars, the officers prepared to have it towed to a local
auto-body shop.  But before it was towed, in accordance with the
Norwalk Police Department's policy of conducting inventory
searches prior to towing, Sergeant King searched the car and
found, in the passenger compartment, in a leather case, a Tangent
scale that was covered with a white-powdery residue.

Mims did not testify at the suppression hearing, but by
affidavit in support of his motion, he proffered that: "Contrary
to what is stated in the police reports, I was not in the car
when the police arrived and I did not exit the car in a hurry.  I
had been inside the building at Roodner Court and I was leaving
the building when I saw an officer with his gun drawn at the
occupants of the car lot [sic].  That officer ordered me to
leave, and I started to do so but another officer ordered me to
come back, and I was searched."

In support of his motion, Mims offered the testimony of his

6

sister, Evertha Mims.  She testified that she is very close to her brother, that she is Mason Mims's cousin, and that she had a prior romantic relationship and a child with Victor Cruz. Evertha Mims confirmed that Mims, Mason Mims and Victor Cruz had been at the Moose Lodge until closing time on the night of March 14, 2004, and that afterwards, Mims drove to Roodner Court in the Taurus that was driven by Mason Mims, that they parked outside Building 19, and that her Blazer was parked directly behind the Taurus.

Evertha Mims also testified that she went into her sister's apartment in Building 19 to pick up her daughter, who her sister was looking after, and to grab something to eat before going home.  She stated that the police were not present when she arrived at Roodner Court and that Mims was in Building 19 and was not in the Taurus when the police arrived.  She further testified that she left the building a full three minutes after Mims left, and that when she went outside, the police had Mims on the ground and were arresting him.  She stated that it would take only "a couple of seconds" for someone to get from the doorway of Building 19 to the spot where the Taurus was parked.  She also confirmed that Mims did not live at Roodner Court; that he was heading home; that her cousin Mason Mims was going to give him a ride home; and that he had to get back into Mason Mims's Taurus for that purpose.

DISCUSSION

Mims asserts that Officer Suda and Sergeant King subjected him to a warrantless search on March 14, 2004, in violation of his rights under the Fourth Amendment and moves to suppress from evidence all fruits of that illegal search.  He argues that Sergeant King and Officer Suda did not have sufficient, reliable information to form a reasonable suspicion justifying an investigatory stop under Terry v. Ohio, 392 U.S. 1 (1968), and thus, the stop and the search were unconstitutional.  See, e.g., Florida v. J.L., 529 U.S. 266, 271 (2000).  The government opposes the motion and additionally asserts that Mims lacks standing to challenge the admissibility of the evidence seized from the Taurus.

I.    THE LAW

The Fourth Amendment states that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  Police have constitutional authority consistent with the Fourth Amendment to briefly detain a suspect when an officer has a reasonable suspicion that "criminal activity may be afoot."  Terry, 392 U.S. at 30 (construing the Fourth Amendment as permitting police officers to briefly detain an individual for questioning if they have a reasonable,

8

articulable suspicion that the individual may be engaging in, or is about to engage in, criminal activity, and may frisk him if they have a reasonable suspicion that he may be armed and dangerous).  While reasonable suspicion is a less demanding standard than probable cause, the Fourth Amendment requires at least a minimal level of objective justification for making the stop.  See Illinois v. Wardlow, 528 U.S. 119, 123 (2000).

A court must examine the "totality of the circumstances", when deciding whether the police officers at the scene had an "articulable and objectively reasonable belief" sufficient to justify a Terry stop.  See McCardle v. Haddad, 131 F.3d 43, 49 (2d Cir. 1997) (quoting Michigan v Long, 463 U.S. 1032, 1051 (1983)).  The officers "must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch"' . . . [because] [t]he Fourth Amendment requires 'some minimal level of objective justification' for making the stop."  United States v. Sokolow, 490 U.S. 1, 7 (1989).

The police may use information obtained from confidential informants as a basis for reasonable suspicion as long there are "sufficient indicia of reliability" supporting the information or tip.  See Alabama v. White, 496 U.S. 325, 328-331 (1990). Informants that the police have used before, or ones known to the police, make a stronger case for reliability than anonymous tipsters.  See Adams v. Williams, 407 U.S. 143, 146-47 (1972).

9

This is especially true when the information is provided in a face-to-face setting, as the informant runs a greater risk of being held accountable for his or her statements.  See United States v. Salazar, 945 F.2d 47, 50-51 (2d Cir. 1991).  An informant's belief that he can be tracked down and held accountable for his information is critical in determining the informant's reliability.  See United States v. Colon, 250 F.3d 130, 133 (2d Cir. 2001).

If an officer has reason to believe he is dealing with an individual who is armed and dangerous, he may conduct a reasonable search for weapons for his protection.  See Terry, 392 U.S. at 27.  "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his safety or that of others was in danger."  Id.

In Michigan v. Long, the Supreme Court, while extending Terry's application to protective area searches of vehicles to uncover weapons, reasoned that police investigations at close range, such as those involved during car stops, leave officers particularly vulnerable "because a full custodial arrest has not been effected, and the officer must make a 'quick decision as to how to protect himself and others from possible danger . . . .'" Terry, 392 U.S. at 28.  Accordingly, a protective pat-down of an individual for weapons during an investigative stop is permitted

10

for officer safety.

Moreover, efforts to flee or evade law enforcement officers provide additional grounds to support reasonable suspicion -- including evasive efforts that take place between the time period when officers attempt to initiate a stop and the point when the stop is secured.  See Illinois v. Wardlow, 528 U.S. 119, 124 (2000); United States v. Swindle, 407 F.3d 562, 568 (2d Cir. 2005) (recognizing that actions of a defendant, including evasive actions, between the time officers attempt to initiate a stop and the time the defendant is actually stopped, may support reasonable suspicion).

Also, under the plain "feel" extension of the plain-view doctrine, police officers may lawfully seize evidence obtained when they lawfully pat down an individual's outer clothing and feel an object that, based on their training and experience, they recognize to be contraband.  See, e.g., Minnesota v. Dickerson, 508 U.S. 366 (1993); United States v. Ocampo, 650 F.2d 421 (2d Cir. 1981).  Moreover, under the "search-incident-to-arrest" exception to the Fourth Amendment's warrant requirement, law enforcement officers can conduct a search of persons subject to arrest and the area into which an arrestee might reach in order to grab a weapon or evidentiary items.  See Chimel v. California, 395 U.S. 752 (1969).  Further, under the automobile exception to the Fourth Amendment warrant requirement, an automobile may be

searched if probable cause exists to believe that the automobile contains contraband.  See United States v. Ross, 456 U.S. 798, 804-09 (1982).

Fourth Amendment rights are personal, and may be enforced only by persons whose own protections under the amendment have been violated.  See United States v. Fields, 113 F.3d 313, 320 (2d Cir. 1997).  Thus, where a Fourth Amendment violation is claimed, a defendant seeking to have evidence suppressed must have "standing" to challenge the search or seizure, i.e., a reasonable expectation of privacy in the location or items searched.  See Rakas v. Illinois, 439 U.S. 128, 143 (1978).  "For an individual's expectation of privacy to be legitimate, he must have exhibited an actual (subjective) expectation of privacy and the expectation must be one that society is prepared to recognize as reasonable."  U.S. v. Reyes, 283 F.3d 446, 457 (2d Cir. 2002) (internal quotation marks omitted).  The touchstone of a reasonable expectation of privacy is some property or possessory interest in the area or item searched.  Rakas, 439 U.S. at 142-43.

II.  ANALYSIS

Based on the facts adduced at the hearing and the relevant law, the court finds that the officers had reasonable suspicion to stop Mims, and thus were within the law when they conducted the pat-down search of Mims that resulted in the seizure of the

12

handgun and drugs from his person.  Further, the court finds that Mims does not have standing to challenge the search of the Taurus and thus concludes that his rights were not violated by the seizure of items from that car.

   A.   Reasonable Suspicion For Terry Stop

   The officers had ample reasonable suspicion to initiate a Terry investigative stop of Mims as he was walking away from the Taurus based on the information they had just learned from a reliable confidential informant who had previously provided them with information leading to 60 arrests.  The CI's information was specific as to the individuals involved, the color, make, and license plate of the vehicle, and the type of criminal activity in which the individuals were engaged.  The CI's information was almost contemporaneous and the officers acted on it immediately. The CI was not only known to the officers, but provided the information face-to-face to Officer Suda.  Further, the officers corroborated the CI's information that Mason Mims was the owner of the Taurus, and personally recognized Mims, Mason Mims, and Jeff Moore as the occupants of the car.

   Also, based on the CI's information that the individuals, specifically Mims, were armed, it was reasonable for Officer Suda to conduct a pat down of Mims's person for officer safety.  See Michigan v Long, 463 U.S. 1032, 1051 (1983) (holding that police investigations at close range, such as those involved during car

stops, leave officers particularly vulnerable "because a full custodial arrest has not been effected, and the officer must make a 'quick decision as to how to protect himself and others from possible danger . . . .'").

In addition to the information provided by the CI, Mims's efforts to leave the vehicle and to avoid the officers further established a basis for reasonable suspicion supporting a <u>Terry</u> stop. <u>See</u> <u>Wardlow</u>, 528 U.S. at 124; <u>Swindle</u>, 407 F.3d at 568. Suda and King testified that Mims and the other individuals began disobeying their commands and moving their hands in a manner that caused the officers great concern. This behavior, combined with the officers' knowledge of the individuals and the information provided by the CI that Mims had a handgun in his possession, also gave rise to a reasonable fear for their safety. Thus, Officer Suda acted reasonably when he conducted a limited, protective pat-down of Mims's outer clothing.

Moreover, once Suda felt an object under Mims's clothing that he believed from his training and experience to be a handgun, he was lawfully permitted to seize the gun under the plain "feel" extension of the plain-view doctrine. <u>See</u>, <u>e.g.</u>, <u>United States v. Ocampo</u>, 650 F.2d 421 (2d Cir. 1981) (holding that officers may lawfully seize evidence obtained when the officer lawfully pats down an individual's outer clothing and feels an object that, based on his training and experience, the

officer recognizes to be contraband).

Even if the court were to credit Mims's proffered statement that he was not in the car at the time the officers arrived at Roodner Court and the testimony of Evertha Mims that Mims had been in Building 19, the court would nonetheless conclude that the officers had reasonable suspicion to detain Mims.

Thus, because Mims's actions, including leaving the vehicle and attempting to leave the area upon seeing the approaching officers, and Mims's efforts to resist Officer Suda after he was detained, together with the CI's information that he was engaged in unlawful activity and possessed a firearm, gave Officer Suda reasonable suspicion under <u>Terry</u> to detain him and conduct a pat-down search.  Thus, the evidence obtained during the pat-down search was lawfully obtained under <u>Terry</u> and is admissible.

B.   <u>Search Incident to Arrest</u>

Once Mims was lawfully detained under <u>Terry</u>, additional circumstances provided probable cause to arrest him, and thus the officers had the authority to conduct a more thorough search of his person incident to arrest.  <u>See</u>, <u>e.g.</u>, <u>Chimel v. California</u>, 395 U.S. 752 (1969).

In this regard, the government argues that Officer Suda had probable cause to arrest Mims for interfering with an officer, and thus the seizure of the weapon would have been permissible pursuant to a search incident to lawful arrest.  But even if Mims

15

had not so interfered, Officer Suda had probable cause to arrest
him when he found a handgun on Mims's person.  Suda knew that
Mims was a convicted felon and, as such, was prohibited from
possessing a firearm under both federal and state law.
Consequently, the officer then had the authority to conduct a
more probing search incident to his arrest.  See Chimel, 395 U.S.
at 763 (1969).  Thus, the small plastic baggy containing crack
that Officer Suda found in Mims's right-front pants pocket was
lawfully seized also as a search incident to a lawful arrest.

    C.    Standing to Challenge Automobile Search

    Mims also challenges the admissibility of the evidence
seized from the Taurus.  The government maintains that he does
not have standing to do so.  The court agrees.

    Because Mims has not established that he exhibited an actual
subjective expectation of privacy in the Taurus, he has no
standing to object to the search of that vehicle.  See Reyes, 283
F.3d at 457.  The evidence shows that the Taurus was registered
to and driven by Mason Mims, and that Mims was merely a
passenger.  Mims did not present any evidence that he has any
property or possessory interest in Mason Mims's vehicle.

    Accordingly, to the extent that Mims's motion also seeks to
suppress the evidence seized from the Taurus, specifically, the
Tangent digital scale that was found in the car, because Mims did
not meet his burden of establishing a reasonable expectation of

16

privacy in Mason Mims's car, he has no recourse under the Fourth Amendment to challenge the seizure and search of that vehicle.

<u>CONCLUSION</u>

For the foregoing reasons, Mims's motion to suppress [doc # 12] is denied.

SO ORDERED, this 19th day of December, 2005.

_____/s/_____
Alan H. Nevas
United States District Judge
